ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| NADIA I. QUILES SANTIAGO, RAYMOND CHAPARRO LORENZO Y LA SOCIEDAD E BIENES GANANCIALES COMPUESTA POR AMBOS<br><br>Parte Recurrida<br><br>v.<br><br>BLUE WATERS CHARTERS, LLC; VIEQUES AIR LINK, INC.; STARR INDEMNITY & LIABILITY COMPANY<br><br>Parte Peticionaria | TA2025AP00302 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.:<br><br>SJ2021CV03338<br><br>Sobre:<br><br>Daños y Perjuicios |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y la Jueza Prats Palerm.

Monge Gómez, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 24 de septiembre de 2025.

Compareció ante este Tribunal la parte peticionaria, Vieques Air Link, Inc. (en adelante, "VAL" o "Peticionario"), mediante un recurso de apelación que acogimos como un auto de *certiorari* mediante *Resolución* de 3 de septiembre de 2025. Nos solicitó la revocación de la *Sentencia Parcial* emitida y notificada el 1 de agosto de 2025, por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, "TPI"). Mediante el referido dictamen, el foro recurrido desestimó el caso en contra de Blue Waters Charters, LLC (en adelante, "Blue Waters"). Sin embargo, determinó que existían controversias de hechos medulares que impedían la adjudicación de la totalidad del pleito instado en contra del Peticionario.

Por los fundamentos que exponemos a continuación, se *expide* el recurso de *certiorari* y *confirmamos* el dictamen recurrido.

**I.**

El presente recurso tuvo su génesis el 31 de mayo de 2021, cuando la Sra. Nadia I. Quiles Santiago (en adelante, señora "Quiles Santiago"), el

Número Identificador
SEN2025_____

Sr. Raymond Chaparro Lorenzo (en adelante, señor "Chaparro Lorenzo") y la sociedad de bienes gananciales compuesta por ambos (en adelante y en conjunto, "Chaparro-Quiles" o los "Recurridos") presentaron una "**Demanda**" sobre daños y perjuicios sufridos como consecuencia de un accidente de aviación que ocurrió el 2 de junio de 2020. En este trágico suceso, mientras laboraba para Propilot, LLC (en adelante, "Propilot"), el señor Chaparro Lorenzo sobrevivió un accidente de aviación que le causó la muerte a su compañero, el Sr. Samuel Galarza Guzmán (en adelante, "señor Galarza Guzmán") y al piloto, el Sr. Luis Torres Gavino (en adelante, "señor Torres Gavino").

De las alegaciones de la *Demanda* surge que, Propilot acordó con Blue Waters proveer servicios de mejoras requeridas por la reglamentación federal para el avión Piper Azteca N14181 (en adelante, "Piper Azteca") y poder estar en posición de efectuar los conocidos en la industria como "charter flights". El día de los hechos, Propilot asignó al señor Galarza Guzmán y al señor Chaparro Lorenzo, para la instalación de equipos electrónicos a la nave. Como parte del proceso para realizar los aludidos viajes, el *U.S. Department of Transportation* requería un vuelo de prueba para cumplir con los requisitos establecidos en la reglamentación de la *Federal Aviation Administration* (en adelante, "FAA"). Con ese propósito, Blue Waters contrató a VAL para que el señor Torres Gavino fungiera como piloto.

Los Recurridos sustentaron que, sin realizar un vuelo de seguridad previo, los empleados de Propilot abordaron el avión para un vuelo de prueba. Según lo expuesto, el piloto Torres Gavino abortó el primer intento de despegue, ya que determinó que había una falla en la rueda izquierda del avión, posteriormente, tuvo cinco (5) intentos fallidos para encender la nave, luego de que el motor del lado izquierdo se apagara. Dado a que no se alcanzó la velocidad necesaria para elevarse, el Piper Azteca no tuvo propulsión, el piloto perdió el control de la nave e impactó el mástil de un velero. Como resultado, el avión se estrelló en la Bahía de San Juan. Tras dicho accidente, solo sobrevivió el señor Chaparro Lorenzo. A raíz de los

mencionados eventos fácticos, los Recurridos solicitaron una cantidad global de 4,300,000.00 por daños y perjuicios más los intereses, gastos, costas y honorarios de abogados.

Posteriormente, Chaparro-Quiles presentó una enmienda a la *Demanda* para acumular con el nombre correcto a la compañía aseguradora de Blue Waters, a saber: Starr Indemnity & Liability Company. El 17 de noviembre de 2023, los Recurridos presentaron "**Segunda Demanda Enmendada**" para aumentar las cuantías inicialmente solicitadas por los presuntos daños y perjuicios sufridos.

En el ínterin, compareció la Corporación del Fondo del Seguro del Estado (en adelante, "Fondo") por vía de una "**Solicitud de Intervención y Demanda de Subrogación**" (en adelante, "Demanda de Subrogación"). Sostuvo que el Fondo había ofrecido servicios de tratamiento al señor Chaparro Lorenzo y que tenía un derecho prioritario al recobro de los gastos incurridos en la tramitación, tratamiento y compensación que se le brindó. A la luz de lo anterior, solicitó que se reservara de la *Sentencia* que en su día el TPI dicte a favor de los Recurridos la cantidad de $115,521.94, para ser pagada al Administrador del Fondo.

Así pues, el 14 de diciembre de 2023, Blue Waters, VAL y Starr Indemnity & Liability Company presentaron su "**Contestación a Segunda Demanda Enmendada (SUMAC Núm. 137)**" en la que alegaron afirmativamente que Propilot era un patrono asegurado con una póliza vigente ante la Corporación del Fondo del Seguro del Estado (en adelante, "Fondo"). De este modo, sostuvieron que Blue Waters, como subcontratante de los servicios de Propilot, cualificaba como patrono estatutario, al amparo de la Ley Núm. 45 de 18 de abril de 1935, conocida como la "Ley del Sistema de Compensaciones por Accidentes del Trabajo", según enmendada, 11 LPRA sec. 1 *et seq.* (en adelante, "Ley Núm. 45"). Asimismo, argumentaron la existencia de una relación contractual directa entre VAL, Blue Waters y ProPilot que hacía extensiva la inmunidad patronal a VAL y Blue Waters. Además, sostuvieron que VAL contaba con su propia póliza vigente que aseguraba al piloto Torres Gavino. En la

alternativa, adujeron que se debía considerar a VAL y Blue Waters como "un solo patrono" tras estar íntimamente relacionadas, por lo que les cobijaba la inmunidad patronal.

Luego de varios trámites procesales, el 2 de mayo de 2025, Blue Waters y VAL presentaron una "**Solicitud de Sentencia Sumaria**" mediante la cual solicitaron la desestimación, con perjuicio, del pleito instado en su contra, incluyendo la *Demanda de Subrogación*. Reiteraron que Blue Waters acordó con VAL el arrendamiento de la nave, si este último realizaba las gestiones de compra e instalación de todo equipo necesario para cumplir con las regulaciones necesarias. Por ende, alegaron que VAL siendo el dueño de la obra, aseguró el avión y a los empleados a bordo mediante una póliza de seguro. Ergo, al amparo de la Ley Núm. 45 se le debía conferir la inmunidad patronal. Por otra parte, añadieron que, si se determinaba que Blue Waters era el dueño de la obra, de todos modos, se extendía la protección legal a los Recurridos, toda vez que el piloto Torres Gavino también fungía como *Chief Pilot* de Blue Waters. Así pues, reafirmaron que Blue Waters y VAL debían considerarse como "un solo patrono" para propósitos de la extensión de la póliza de seguros.

Consecuentemente, el 3 de junio de 2025, los Recurridos presentaron la "**Oposición a Moción de Sentencia Sumaria (SUMAC #207)**", en la cual señalaron que Blue Waters contrató directamente a Propilot para los servicios requeridos del Piper Azteca. De igual forma, indicaron que Blue Waters emitió los pagos de los servicios recibidos. Siendo así, establecieron que entre VAL y Propilot no existe un vínculo obrero-patronal, por lo que no puede considerarse patrono estatutario. Por tanto, el Peticionario era un tercero desprovisto de la protección legal. En cambio, enfatizaron que no podía considerarse como único patrono, ya que ambas compañías eran entidades separadas y creadas para fines diferentes.

Consideradas ambas mociones, el TPI emitió una *Sentencia Parcial* el 1 de agosto de 2025. En ésta, desestimó la *Demanda* en contra de Blue

Waters, más no así en contra de VAL. Además, consignó los siguientes hechos incontrovertidos:

1. VAL es una empresa dedicada a la operación de una aerolínea regional, según surge de su Certificado de Incorporación.

2. Blue Waters es una corporación cuyo propósito estriba en "poseer título de dueño, arrendar, utilizar y/o administrar naves aéreas, transportar carga y pasajeros por medio de naves aéreas o cualquier equipo de transportación similar".

3. Carlos Rodríguez es el presidente de VAL y Blue Waters.

4. El 1 de enero de 2015, Blue Waters y VAL otorgaron el contrato intitulado *Aircfrat Lease Agreement* para el arrendamiento de la nave Britten-Norman Islander Airframe BN-2ª-9 modificado a BN-2A-27 con número de registro N907VL. Dicho contrato tenía vigencia hasta el 31 de diciembre de 2017.

5. En esa misma fecha, el 1 de enero de 2015, Blue Waters y VAL otorgaron el contrato intitulado *Aircraft Lease Agreement* para el arrendamiento de la nave Britten-Norman Islander Airframe BN-2A-26 con número de registro N908VL. Dicho contrato tenía vigencia hasta el 31 de diciembre de 2018.

6. El 3 de septiembre de 2015, VAL suscribió con Blue Waters un documento intitulado Carta Acuerdo mediante la cual VAL manifestó su deseo de entrar en un contrato de alquiler del avión modelo Piper Azteca N14181.

7. Conforme dispone la Carta Acuerdo, las partes acordaron lo siguiente:
VAL se hará responsable de lo siguiente:
- De todo el mantenimiento del avión Azteca N14181
- Comprará e instalará todo equipo necesario para llevarla a las especificaciones de IFR requeridas
- Documentará todo lo necesario con el FAA para obtener las certificaciones IFR requeridas

BWAC se hará responsable de lo siguiente:
- Una vez VAL concluya con la debida instalación y certificación del avión BWAC se compromete a alquilar el avión bajo las mismas condiciones que el arrendamiento de los Islanders.

8. El 27 de febrero de 2019, VAL otorgó un contrato un Acuerdo de gravamen mobiliario con el Banco Popular de Puerto Rico (BPPR) mediante el cual acordó ceder al banco y constituir un gravamen a favor del BPPR sobre el equipo, entre estos, unas instalaciones en la nave identificada con número N14181.

9. Para el 2 de junio de 2020, Torres Gavino era empleado de VAL y servía como Director de Operaciones.

10. Torres Gavino era un piloto certificado por la *Federal Aviation Administration* (FAA) como *Airline Transport Pilot* y Mecánico.

11. Para el 2 de junio de 2020, Blue Waters era la dueña registral del avión Piper Azteca Modelo PA-23-250, número de serie 27-4746, y número de registro N15181.

12. El 5 de febrero de 2020, Pro Pilot emitió una cotización para la instalación de *avionics* a nombre de Blue Waters, titular registral del Piper Azteca N14181.

13. Las instalaciones de *avionics* cotizados requerían un vuelo de prueba o test flight para confirmar el funcionamiento y el cumplimiento de las instalaciones con los requerimientos de la FAA.

14. El 19 de mayo de 2020, Blue Waters emitió un cheque por la suma de $43,049.59 a nombre de Pro Pilot para el pago de los equipos y los trabajos de instalación de *avionics* solicitados a Pro Pilot.

15. Chaparro Lorenzo se desempeñaba como empleado de Caribbean Avionics, una división de Pro Pilot.

16. Pro Pilot asignó a Chaparro Lorenzo y a Galarza Guzmán para llevar a cabo las instalaciones de los *avionics* en el Piper Azteca N14181.

17. En el curso de su empleo con Pro Pilot, desde febrero de 2020 y para el 2 de junio de 2020, Chaparro proveyó servicios de instalación de *avionics* para el Piper Azteca N14181, y emitió certificaciones requeridas para tales servicios por el *U.S. Department of Transportation, Federal Aviation Administration* (FAA).

18. El 2 de junio, mientras se intentaba ejecutar el vuelo de prueba requerido, VAL procuró el combustible para dicha nave a la compañía Million Air.

19. Al 2 de junio de 2020, Pro Pilot tenía la póliza de seguro número 1912002964 vigente con la CFSE.

20. Al 2 de junio de 2020, VAL tenía la póliza de seguro número 35-1-40-83522 vigente con la CFSE, la cual incorpora cubierta a empleados a bordo de aeronaves.

21. Chaparro Lorenzo recibió el máximo beneficio del tratamiento de la CFSE.

22. Para el 2 de junio de 2020, Blue Waters no tenía empleados.

En su análisis, el TPI destacó que, las controversias existentes son medulares. Determinó que, las incongruencias y las contradicciones en los documentos presentados no le permiten, en esta etapa de los procedimientos, establecer claramente la relación contractual de VAL con Blue Waters para así declarar a VAL como patrono estatutario. Además, señaló que de los escritos presentados no surge que VAL fuera dueño de la obra y tampoco lo responsabilizan de los pagos realizados a Propilot.

Finalmente, el foro a quo concluyó que no podía determinar si VAL y Blue Waters podían ser considerados como "un solo patrono".

Inconforme, VAL señaló el siguiente error:

ERRÓ Y ABUSÓ DE DISCRECIÓN EL TRIBUNAL DE PRIMERA INSTANCIA AL NO DESESTIMAR LA CAUSA DE ACCIÓN EN CONTRA DE VIEQUES AIR LINK POR NO OTORGAR EL DEBIDO PESO A LOS HECHOS MATERIALES INCONTROVERTIDOS Y A LA EVIDENCIA DOCUMENTAL QUE ACOMPAÑÓ LA SOLICITUD DE SENTENCIA SUMARIA, EN CLARO INCUMPLIMIENTO CON LA REGLA 36.3 DE PROCEDIMIENTO CIVIL.

El 22 de septiembre de 2025, comparecieron los Recurridos mediante "**Oposición a *Certiorari***".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**

El propósito de las Reglas de Procedimiento Civil es proveerles a las partes que acuden a un tribunal una "solución justa, rápida y económica de todo procedimiento". 32 LPRA Ap. V, R.1. Así, la Regla 36 del mencionado cuerpo procesal atiende lo referente al mecanismo de sentencia sumaria. A la luz de sus disposiciones, se dictará sentencia si de "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y que como cuestión de derecho el tribunal debe dictar la sentencia sumaria a favor de la parte promovente". Regla 36.3 de Procedimiento Civil, 32 LPRA, Ap. V, R. 36.3.

En ese sentido, se considera un hecho material o esencial, "aquel que pueda afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". Oriental Bank v. Caballero García, 212 DPR 671, 679 (2023). Cabe señalar que el juzgador no está limitado a los hechos o documentos que se produzcan en la solicitud, sino que puede tomar en consideración todos los documentos que obren en el expediente del

tribunal. <u>SLG Szendrey-Ramos v. Consejo Titulares</u>, 184 DPR 133, 167 (2011).

Solamente se dictará sentencia sumaria en casos en los cuales el tribunal cuente con la verdad de todos los hechos necesarios para resolver la controversia y surja claramente que la parte promovida por el recurso no prevalecerá. <u>Oriental Bank v. Caballero García</u>, *supra*, pág. 678. Sin embargo, el tribunal no podrá dictar sentencia sumaria cuando: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la Demanda que no han sido refutadas; (3) surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material; o (4) la moción no procede como cuestión de derecho. <u>S.L.G. Szendrey-Ramos v. Consejo de Titulares</u>, *supra*, pág. 168. **Para prevalecer, el promovente de este recurso debe presentar una moción fundamentada en declaraciones juradas o en cualquier evidencia admisible que demuestre la inexistencia de una controversia sustancial de hechos materiales sobre la totalidad o parte de la reclamación**. <u>Oriental Bank v. Caballero García</u>, *supra*, pág. 678; <u>Ramos Pérez v. Univisión</u>, 178 DPR 200, 221 (2010).

Por su parte, la parte promovida por una moción de sentencia sumaria debe señalar y refutar los hechos materiales que entiende están en controversia y que son constitutivos de la causa de acción del demandante. <u>Rosado Reyes v. Global Healthcare,</u> 205 DPR 796, 808 (2020); <u>Oriental Bank v. Perapi *et al*.</u>, 192 DPR 7, 25-26 (2014). Así, la parte que se opone a que se dicte sentencia sumaria en su contra debe controvertir la prueba presentada y no cruzarse de brazos. <u>E.L.A. v. Cole</u>, 164 DPR 608, 626 (2005). **No puede descansar en meras afirmaciones contenidas en sus alegaciones ni tomar una actitud pasiva, sino que está obligada a presentar contradeclaraciones juradas y/o contradocumentos que pongan en controversia los hechos presentados por el promovente**. <u>Oriental Bank v. Caballero García</u>, *supra*, pág. 8; <u>Roldán Flores v. M. Cuebas *et al*.</u>, 199 DPR 664, 677 (2018).

Adicionalmente, en <u>León Torres v. Rivera Lebrón</u>, 204 DPR 20, 47 (2020), el Tribunal Supremo resolvió que ninguna de las partes en un pleito puede enmendar sus alegaciones a través de la presentación de una solicitud de sentencia sumaria o su oposición. Así que, según lo expresa el propio tribunal, "la parte que se opone a una solicitud de sentencia sumaria no puede traer en su oposición, de manera colateral, defensas o reclamaciones nuevas ajenas a los hechos consignados en sus alegaciones, según consten en el expediente del tribunal al momento en que se sometió la moción dispositiva en cuestión". <u>Íd</u>., pág. 54.

Según las directrices pautadas por nuestro más alto foro, una vez se presenta la solicitud de sentencia sumaria y su oposición, el tribunal deberá: (1) analizar todos los documentos incluidos en ambas mociones y aquellos que obren en el expediente del tribunal; y (2) determinar si la parte opositora controvirtió algún hecho material o si hay alegaciones en la demanda que no han sido refutadas en forma alguna por los documentos. <u>Abrams Rivera v. ELA</u>, 178 DPR 914, 932 (2010).

Al examinar la procedencia de una moción que solicita disponer de un caso sumariamente, el tribunal no tiene que sopesar la evidencia y determinar la veracidad de la materia, sino que su función estriba en determinar la existencia o no de una controversia genuina, la cual amerite ser dilucidada en un juicio plenario. <u>J.ADM v. Centro Com. Plaza Carolina</u>, 132 DPR 785, 802-803 (1993). Además de que "[t]oda inferencia razonable que se realice a base de los hechos y documentos presentados, en apoyo y en oposición a la solicitud de que se dicte sentencia sumariamente, debe tomarse desde el punto de vista más favorable al que se opone a ésta". <u>ELA v. Cole</u>, 164 DPR 608, 626 (2005).

En el caso de revisar la determinación del TPI respecto a una sentencia sumaria, este foro apelativo se encuentra en la misma posición que el foro de instancia para evaluar su procedencia. <u>Rivera Matos *et al.* v. Triple-S *et al.*</u>, 204 DPR 1010, 1025 (2020); <u>Meléndez González *et al.* v. M. Cuebas</u>, 193 DPR 100, 118 (2015). La revisión que realice el foro apelativo deberá ser *de novo* y estará limitada a solamente adjudicar los documentos

presentados en el foro apelado. <u>Vera v. Dr. Bravo</u>, 161 DPR 308, 335 (2004)*.* De modo que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. <u>Íd</u>. En adición a esta limitación, se ha aclarado que al foro apelativo le está vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia. <u>Íd</u>. págs. 334-335.

En <u>Meléndez González *et al.* v. M. Cuebas</u>, *supra*, nuestro más Alto Foro delimitó los pasos del proceso a seguir para la revisión de la sentencia sumaria por parte de este foro revisor, el cual consiste de: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles son incontrovertibles; (4) y, de encontrar que los hechos materiales realmente son incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho a la controversia. <u>Íd</u>., págs. 118-119.

**B.**

La Ley Núm. 45, *supra*, sirve como medida de protección social para garantizar la compensación del obrero contra riesgos a su salud relacionados con el trabajo. <u>Arzuaga Monserrate v. Empresas Ortiz Brunet, Inc.</u>, 211 DPR 803, 810 (2023). El estatuto establece una compensación para los empleados que se accidentan, se lesionan o mueran a raíz de un accidente en el empleo. <u>López v. Western Auto</u>, 171 DPR 185, 192 (2007). Esta aportación patronal que le garantiza la compensación al obrero, a su vez reconoce la inmunidad del patrono contra los daños y perjuicios que pudiera reclamar el empleado. <u>Arzuaga Monserrate v. Empresas Ortiz Brunet, Inc</u>., *supra*, págs. 810-811. El precepto no funge como una defensa disponible para el patrono, sino que equivale a la inexistencia total de una

posible causa de acción. SLG Ortiz-Cintrón v. Rivera Núñez *et al.*, 194 DPR 936, 942 (2016).

En concordancia con lo anterior, el Artículo 17 del estatuto dispone la llamada cláusula de contratista. A esos efectos, establece la obligación de asegurar subsidiariamente a los empleados de los patronos con los que "ajustó o contrató y los de un contratista o subcontratista independiente cuando estos no aseguren a sus propios empleados". Íd.; *véase, además*, 11 LPRA sec. 20. Igualmente, el Artículo 18 de la referida ley dispone que "[c]uando el patrono asegure sus obreros y empleados de acuerdo con la presente ley, el derecho aquí establecido para obtener compensación será el único remedio en contra del patrono […]". 11 LPRA sec. 21. Por lo que, el pago de esta póliza inmuniza a todos los patronos independientemente de que el pago se haya realizado por el contratista, subcontratista, o en la alternativa, el dueño de la obra. Viuda de Costas v. PR Olefins, 107 DPR 782, 785 (1978).

Para invocar esta inmunidad de manera exitosa es necesaria la existencia de un nexo causal entre el accidente y el empleo, en específico es indispensable que: "(a) provenga de cualquier acto o función del obrero; (b) sea inherente al trabajo o empleo del obrero, y (c) ocurra en el curso de éste". López v. Western Auto, *supra*, pág. 195. Así, el empleado no tiene que probar que hubo negligencia por parte del patrono. Guzmán y ortos v. ELA, 156 DPR 693, 729 (2002). Por otro lado, la inmunidad "tampoco se extiende a las lesiones producidas intencionalmente por el patrono". Soc. de Gananciales v. Royal Bank de PR, 145 DPR 178, 196 (1998).

Nuestro más alto foro discutió que la negligencia crasa por parte del patrono al no proveer un ambiente laboral seguro no constituye una excepción ante la inmunidad patronal, por lo que el único remedio disponible es aquel provisto por el Fondo. Hernández v. Bermúdez & Longo, SE, 149 DPR 543, 549 (1999).

Sobre la figura del patrono estatutario, el Tribunal Supremo lo definió como "aquel que contrata los servicios de otra compañía y […] los trabajadores de ésta. De este modo, tales obreros tienen un patrono directo

o real —que es aquel con quien contrataron— y un patrono indirecto o estatutario, que es aquel con quien contrató su patrono directo o real". Martínez v. Bristol Myers, Inc., 147 DPR 383, 395–396 (1999). Igualmente puntualizó que la inmunidad de un patrono estatutario opera en dos (2) circunstancias:

> (1) si cumple con su obligación de asegurar ante el Fondo a los trabajadores del patrono real que éste no haya asegurado, o (2) si el patrono que él contrató para que le realizara determinados servicios ha asegurado a sus trabajadores, los cuales van a realizar tales servicios para el patrono estatutario. Íd., pág. 397.

Existe una importancia de distinguir a un patrono estatutario de un tercero, ya que "mientras el patrono estatutario queda cobijado por la inmunidad que protege al patrono directo asegurado o por su propia inmunidad si cumple con la obligación de asegurar a los trabajadores no asegurados por el patrono directo, el tercero causante del daño será responsable ante demandas judiciales en daños y perjuicios". Íd., pág. 398. De manera que, cuando alguno de los patronos, a lo largo de la misma cadena contractual, adquiere una póliza de seguro obrero-patronal con el Fondo, **beneficia a los demás patronos envueltos en el contrato de obra o servicio y les provee inmunidad en contra de las acciones de daños**. SLG Ortiz-Cintrón v. Rivera Núñez *et al*, *supra*, pág. 945. **Es decir, el tercero es una persona extraña a la relación entre el patrono estatutario y el contratista en la obligación legal de asegurar a los empleados al amparo de la Ley Núm. 45,** *supra*. Lugo Sánchez v. AFF, 105 DPR 861, 866-867 (1977). De igual forma, no puede considerarse tercero aquella persona a quien la Ley dispensa la obligación de asegurar a los empleados. Íd., pág. 867. De manera que el factor determinante de la inmunidad patronal es el vínculo directo o indirecto entre el trabajador que sufre el accidente. Ruíz Díaz v. Vargas Reyes, 190 DPR 761, 765 (1980).

La doctrina de un solo patrono se desarrolló en Puerto Rico mediante jurisprudencia federal y la Junta de Relaciones del Trabajo Nacional, para proteger el derecho de los obreros. Rodríguez v. Bco. Gub. de Fom. PR, 151 DPR 383, 397 (2000); JRT v. Asoc. C. Playa Azul I, 117

DPR 20, 28 (1986). Esta se utiliza generalmente cuando se trata de compañías que coexisten. Íd.

Para determinar la aplicación de la doctrina, el Tribunal Supremo ha señalado los siguientes criterios: "(1) operaciones interrelacionadas; (2) control centralizado de las relaciones laborales; (3) administración común, (4) y propiedad común". JRT v. Asoc. C. Playa Azul I, *supra*, pág. 30. Sobre el primer criterio, se requiere demostrar el control diario sobre las operaciones de la empresa subsidiaria o las funciones del negocio compartidas, tales como los mismos servicios gerenciales. L. Ponce Javier, Estudio de las doctrinas patrono sucesor, álter ego, y un solo patrono en el ámbito federal y local, 4 Rev. Clave, Rev. Estudios Críticos Der. 71, 109 (2009). El siguiente criterio alude al control inusual de una empresa sobre otras; como lo sería la contratación de los empleados o las decisiones que toma una empresa que afecta a la otra. Íd. Subsiguientemente, la doctrina requiere examinar si las entidades comparten la misma junta de directores, oficiales, gerentes u otro personal clave. Íd. Finalmente, se debe evidenciar la propiedad común en el ámbito de un control financiero o el mismo propietario de ambas entidades. Íd.

Cabe destacar que "ninguno de estos factores es determinante, y no es necesario que concurran todos si varias entidades se pueden o no considerar un solo patrono depende de un análisis de todas las circunstancias del caso". JRT v. Asoc. C. Playa Azul I, *supra*, págs. 30-31. Lo importante es establecer la existencia de un control general de los asuntos críticos en los niveles de política laboral de las compañías. Íd., pág. 31. Recordemos que el análisis es uno objetivo y dependerá de la totalidad de las circunstancias del caso. Íd.

**III.**

Luego de examinar el expediente ante nuestra consideración, así como los autos electrónicos del TPI, concluimos que la moción de sentencia sumaria y la correspondiente oposición presentadas por las partes cumplen con los requisitos establecidos en la Regla 36 de las Reglas de Procedimiento Civil, *supra*, y la jurisprudencia antes citada.

En primer lugar y en cumplimiento con la normativa vigente sobre la sentencia sumaria, evaluamos *de novo* las determinaciones de hechos esbozadas por el foro primario y luego de sopesarlas con la prueba documental que obra en autos, las acogemos como nuestras, por no estar en controversia y estar sustentadas en evidencia documental.

El Peticionario nos solicitó la revocación de la *Sentencia Parcial*, toda vez que el TPI desestimó sumariamente el caso en contra de Blue Waters, más no así contra VAL. En síntesis, entiende que erró el foro de instancia al determinar que existen asuntos en controversia que no le permiten disponer del caso mediante la vía sumaria. El Peticionario alega que le cobija la inmunidad patronal dado a que éste contaba con una póliza de seguros propia que protegía la nave y los empleados a bordo. Adujo que se responsabilizó de los trabajos del Piper Azteca, así como de la instalación y el mantenimiento de los equipos necesarios. Señaló que, para cubrir estos gastos, asumió una obligación financiera con gravamen mobiliario sobre los equipos. Argumentó que fungió como dueño de la obra, toda vez que éste fue quien controló, coordinó y dirigió la misma.

También sostuvo que, según el Tribunal Supremo, el factor determinante en la inmunidad patronal es la existencia de un vínculo, directo o indirecto, entre el empleado accidentado y el patrono. A esos efectos, arguyó que existe una relación obrero-patronal entre VAL y Propilot por lo cual tiene la protección legal al amparo de la Ley Núm. 45, *supra*.

En la alternativa, expresó que debía extenderse la inmunidad patronal conferida a Blue Waters, reconocido como patrono estatutario, toda vez que estos deben ser considerados como un solo patrono. Ello a raíz de que ambas compañías tienen el mismo dueño, administración, empleados, oficinas y sus operaciones están interrelacionadas. Además, éstas ejercían control sobre los empleados, particularmente sobre el piloto Torres Gavino, quien se desempeñaba como Director de Operaciones para VAL y alegadamente fungía como *Chief Pilot* de Blue Waters.

Por su parte, los Recurridos argumentan que VAL no demostró la existencia de una relación obrero-patronal con Propilot al momento del

accidente. Señalaron que los documentos presentados por el Peticionario no establecen que Blue Waters y VAL sean la misma compañía para ser consideradas como un solo patrono. Además, indicaron que existen múltiples incongruencias en las alegaciones del Peticionario, toda vez que Blue Waters no contaba con empleados para la fecha de los hechos, según surgió de la deposición del Sr. Carlos Rodríguez. Finalmente, expresaron que algunos de los escritos inducen al Tribunal a error, ya que éstos corresponden a mejoras realizadas en 2018, más no así a aquellas realizadas en el año 2020, referentes a los servicios realizados por el señor Galarza Guzmán y el señor Chaparro Lorenzo.

Según discutimos, el foro de instancia denegó la solicitud de disposición sumaria del pleito en contra del Peticionario tras entender que la evidencia presentada no demostró la inexistencia de controversias medulares. En síntesis, el TPI determinó que no se pudo establecer lo siguiente:

1. La existencia de una relación obrero-patronal o cadena contractual entre VAL y ProPilot para ser considerado como patrono estatutario.

2. Si la póliza de seguros de VAL asegura a los empleados de los contratistas o subcontratistas de esta empresa.

3. Si VAL y Blue Waters deben ser consideradas como un solo patrono.

4. Si VAL puede ser considerado como dueño de la obra.

Tras una evaluación minuciosa de los documentos que obran en el legajo apelativo, al igual que de los autos electrónicos del foro recurrido, encontramos que el foro *a quo* no indició en su determinación al concluir que los anteriores hechos están en controversia. El Peticionario tampoco demostró que el TPI hubiera actuado con perjuicio o cometiera un error manifiesto en su determinación. Nos explicamos.

El argumento de VAL comienza estableciendo la existencia de una póliza de seguros, la cual se encontraba vigente al momento de los hechos. Ahora, éste hace referencia al documento de Certificación, emitido por el Fondo el 29 de septiembre de 2020. Si bien este documento refleja que para el año fiscal 2019-2020 el Peticionario contaba con una póliza de

seguros del Fondo, el contenido se limita a establecer una cubierta de protección a los empleados a bordo de la aeronave. Entiéndase, de esta certificación no se desprenden detalles que rigen el contrato de seguro y el alcance de dicha póliza que nos permita acoger la primera teoría esbozada por el Peticionario, a los efectos de que es improcedente la causa de acción incoada por los Recurridos en su contra por vía de la doctrina de inmunidad patronal. Sin embargo, al estudiar el aludido documento estamos imposibilitados de concluir –de manera automática– que la póliza de seguros se extiende a los empleados de los contratistas y subcontratistas de VAL, pues dicha información no surge de la certificación que se presentó como prueba para sustentar dicha postura.

De todos modos, resulta necesario definir la relación habida entre Propilot y el Peticionario para determinar si se le puede reconocer a este último como patrono estatutario. Adelantamos que no existe en el expediente documento alguno que demuestre de manera alguna que VAL acordó, coordinó o dirigió el mantenimiento del Piper Azteca. Muy por el contrario, la Carta Acuerdo refleja los términos y condiciones para otorgar un contrato de arrendamiento futuro entre Blue Waters y el Peticionario. Entiéndase, este documento por sí solo no demuestra hechos fehacientes de que VAL fuera el encargado de coordinar, dirigir o controlar los servicios en la nave. Es decir, no se desprende del documento que VAL se hubiese obligado a subcontratar o que hubiese subcontratado a Pro Pilot para brindar tales servicios. Tal y como concluyó la juzgadora de instancia, "[t]ampoco surge que se haya acordado utilizar al piloto Torres Gavino y, de esta manera, que se estableciera una relación entre el piloto—empleado de VAL—con Pro Pilot para que realizara la prueba de vuelo requerida".[1]

Más aún, cuando se analiza la documentación que obra en el expediente, se desprende que la cotización de Propilot fue dirigida a Blue Waters. De igual modo, fue Blue Waters quien emitió el cheque para cubrir los gastos de los equipos y la instalación del Piper Azteca. Por tanto, es

---

[1] *Véase*, SUMAC TPI, Entrada Núm. 219, pág. 13.

forzoso concluir que fue Blue Waters quien procuró los servicios de Propilot, **no VAL**. En otras palabras, del expediente no surge ningún documento que establezca relación contractual alguna entre el Peticionario y Propilot que pudiera extender la protección contra causas de acción por daños y perjuicios en contra de VAL. Sobre esto, el expediente ante nuestra consideración también está huérfano.

En cuanto a ello, el Peticionario aduce que suscribió un contrato de gravamen mobiliario para financiar las instalaciones de la aeronave. Sin embargo, de estos documentos no se puede establecer que el referido financiamiento haya sido dirigido o utilizado para las reparaciones efectuadas por Propilot a la fecha del accidente. Sobre este respecto, la evidencia documental a lo único que apunta es a unas reparaciones efectuadas en el año 2018 y las que presuntamente desembocaron en los hechos que dieron paso a la radicación del pleito de epígrafe. Además, dicho acuerdo no le es extensivo a Blue Waters de ninguna manera, ni se puede interpretar que así lo es. En suma, los documentos que tenemos ante nuestra consideración lo único que establecen es que Pro Pilot era el patrono real y Blue Waters el patrono estatutario, no VAL. La doctrina es clara al establecer que la figura del patrono estatutario nace cuando se establece una relación contractual entre el patrono que contrató y el que contrata. No existe prueba que disponga que el Peticionario contrató a Blue Waters como dueño de la obra ni que se hubiera creado una relación indirecta con Pro Pilot. Aquí lo que se demostró, y así lo expuso el TPI en su *Sentencia Parcial*, fue que "Blue Waters subcontrató a Pro Pilot para que le brindara unos servicios de instalación de *avionics*. **Culminada la instalación**, Blue Waters requirió los servicios de un piloto de VAL para que efectuara el vuelo de prueba requerido por reglamentación federal".[2]

Finalmente, el Peticionario argumenta, en la alternativa, que Blue Waters y VAL deben ser consideradas como un solo patrono. Sobre este particular, sometió una Declaración Jurada del Sr. Carlos Rodríguez,

---

[2] Íd., pág. 15.

presidente de ambas compañías. Mediante dicho escrito, el Peticionario pretende establecer los requisitos concernientes a la doctrina que invoca, a saber, arguye que:

1. VAL y Blue Waters son compañías con oficinas, accionistas, directores, oficiales, empleados y administración común, siendo el señor Rodríguez presidente de ambas entidades.

2. VAL y Blue Waters se dedican principal y esencialmente a la misma actividad de negocios, es decir, brindar servicios de transportación aérea a clientes privados dentro de la jurisdicción de Puerto Rico y jurisdicciones adyacentes.

3. VAL y Blue Waters comparten una misma y única estructura de recursos humanos, cuya administración se realiza de manera centralizada por conducto de una misma directora de Recursos Humanos.

4. VAL y Blue Waters comparten la misma fuerza trabajadora y, entre ambas empresas, se asignan empleados para suplir las necesidades del negocio.

5. VAL y Blue Waters comparten el mismo equipo y maquinaria para brindar sus servicios.[3]

Cabe destacar que nuestro máximo foro judicial ha sido enfático al resolver que los hechos debidamente enumerados en una moción de sentencia sumaria sobre los cuales la parte promovente de dicho mecanismo procesal sostiene que están incontrovertidos deben hacer referencia a prueba documental admisible en juicio. Pérez v. Univisión de PR, *supra*, pág. 221.

Sobre lo anterior, no debemos olvidar que las declaraciones juradas ofrecidas por una parte para respaldar sus propios argumentos –práctica conocida como *self-serving*– carecen de valor probatorio por su inherente falta de objetividad. Es decir, una mera declaración jurada de la parte interesada no es suficiente para establecer que ciertos hechos esenciales y pertinentes al caso son incuestionables. Del mismo modo, una moción de sentencia sumaria no puede apoyarse en prueba inadmisible, ya que ello

---

[3] *Véase*, SUMAC TPI, Entrada Núm. 207.

contraviene los principios procesales que rigen en nuestro ordenamiento jurídico.

De igual forma, resulta necesario resaltar varias incongruencias en cuanto a la alegación de que ambas compañías comparten las mismas oficinas, personal y administración. Según surge del propio testimonio del señor Rodríguez consignado en la deposición que le fue tomada como parte del descubrimiento de prueba en el caso, para la fecha de los hechos y al día de la deposición, Blue Waters no tenía empleados.[4] Así pues, queda demostrada una inconsistencia con el argumento de que el piloto Torres Gavino era empleado del Peticionario y de Blue Waters. Tampoco se presentó evidencia más allá de meras alegaciones dirigidas a probar que ambas instituciones se valían del mismo personal, administración o accionistas. Consecuentemente, del expediente electrónico del foro primario surge que el Peticionario negó que las oficinas de Blue Waters sean las mismas que las de éste. Así lo consignó el propio Peticionario en la "**Moción Uniéndose a Solicitud de Desestimación y en Oposición a Solicitud de Anotación de Rebeldía**".[5] Por consiguiente, no obra en el expediente evidencia suficiente que permita sostener que ambas entidades deben ser consideradas como un solo patrono. La mera alegación no resulta, por sí sola, determinante para configurar la doctrina. Corresponde al promovente demostrar con prueba clara y convincente la existencia de un control común, operaciones interrelacionadas o la administración común entre VAL y Blue Waters.

A la luz de lo anteriormente expuesto resolvemos que todas y cada una de las controversias establecidas por el TPI son medulares y pertinentes para la adjudicación en los méritos del caso. No existiendo prueba documental que sustente las mismas, estamos impedidos de acoger la invitación del Peticionario y revertir la determinación recurrida.

---

[4] *Véase*, Íd., Entrada Núm. 209, Anejo 3 pág. 8, líneas 14-20.
[5] Íd., ¶ 9.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, *expedimos* el auto de *certiorari* ante nos y *confirmamos* la *Sentencia Parcial* recurrida, en cuanto a la denegatoria de la solicitud de sentencia sumaria sobre las causas de acción presentadas en contra del Peticionario.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones